JUDGE FRANK MONTALVO

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**El PASO DIVISION**

FILED
2022 SEP 16  PM 3: 46
U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

|  |  |
|---|---|
| MABEL ARREDONDO | § |
| | § |
| | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **FORTUNE 500 CONSULTING GROUP INC** | § |
| a Wyoming Corporation, and | § |
| **CHRISTIOPHER DISIMONE** | § |
| | § |
| **Defendants.** | § |
| | § |

**EP22CV0330**

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1. Plaintiff is MABEL ARREDONDO ("ARREDONDO"), a natural person, and was present in Texas for all calls, in this case in El Paso County.

2. Defendant FORTUNE 500 CONSULTING GROUP ("FORTUNE 500") is a corporation organized and existing under the laws of Wyoming and can be served via registered agent Registered Agents Inc. at 30 N. Gould Street, Suite R, Sheridan, WY 82801.

3. Defendant CHRISTIOPHER DISIMONE ("DISIMONE") is a natural person, president, director, secretary, treasurer, and vice-president of Defendant FORTUNE 500 and can be served at 7418 W Emile Zola Ave, Peoria, Arizona 85381.

4. Defendants FORTUNE 500 and DISIMONE are hereinafter collectively referred together as "Defendants".

**JURISDICTION AND VENUE**

5. <u>Jurisdiction.</u> This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA

1

claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendant's telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

6. **Personal Jurisdiction.** This Court has personal jurisdiction over the Defendant's because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.   Defendant's purposefully engaged in deceptive trade practices and Texas has an interest in protecting its citizens from fraudulent behavior.

7. **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when she received a substantial if not every single call from the Defendant's that are the subject matter of this lawsuit.

8. This Court has venue over the Defendant's because the calls at issue were sent by or on behalf of the above-named Defendants to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION
## ACT OF 1991, 47 U.S.C. § 227

9. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

16. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations."  *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19. The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.  Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

4

21. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

22. Plaintiff's personal cellular telephone number (XXX) XXX-8219 has been successfully registered on the National Do-Not-Call Registry since March 2022.

23. Defendant FORTUNE 500 offers "debt elimination" and "zero percent interest" services to consumers who have credit card debt.

24. Defendant DISIMONE owns and controls Defendant FORTUNE 500.

25. Plaintiff received at least thirty (30) unauthorized phone calls to her personal cell phone ending in 8219 within a twelve-month period from both telemarketers and representatives soliciting "debt elimination" services on behalf of Defendants ("the calls").

26. With information and belief Plaintiff has received more phone calls within the last two years from or on behalf of Defendants soliciting "debt elimination" services that are unknown to Plaintiff at this time but will be revealed during discovery.

27. On May 16, 2022, Plaintiff began to receive a series calls from telemarketers calling on behalf of Defendant's advising Plaintiff that the reason they were calling her was to her assist her with her credit card debt. The telemarketers had a thick accent that seemed to indicate the call

was likely coming from outside the United States.

28. The telemarketers falsely informed Plaintiff they were going to assist with Plaintiff's credit card debt and asked Plaintiff's personal information so they could access Plaintiff's credit card accounts without permission. The telemarketers asked for Plaintiff's birthdate, social security number, credit card numbers, and other identifiable information.

29. The telemarketers then pressed Plaintiff for additional credit cards even though Plaintiff advised that she only had 2 credit cards, one that was about to expire but had not received the new card in the mail.

30. The telemarketers solicited Plaintiff for "zero percent interest" services on behalf of Defendants.

31. The telemarketers then asked if she had any other credit cards that had either a zero or low balance, to which Plaintiff advised that she did not. The telemarketers advised that they were done with the call and that she would notice the zero percent on the upcoming credit card statements and hung up with Plaintiff.

32. On May 18, 2022, Plaintiff received a call from one of the telemarketers calling on behalf of Defendants named Jason Oliver inquiring if Plaintiff had received the updated credit card in the mail, Plaintiff advised that she hadn't received it.

33. Jason verified some additional debt from Plaintiff. Jason advised Plaintiff that she would be connected with a representative from "Capital One" so that Plaintiff can quality for the "debt elimination" program.

34. Jason solicited Plaintiff for "debt elimination" services on behalf of Defendants.

35. After the next male telemarketer verified that Plaintiff was a viable candidate for "debt elimination" Plaintiff was transferred over to Lupita with the verification department who

6

emailed Plaintiff a contract and power of attorney for Plaintiff to sign via Clixsign. *See Exhibit A.* The documents were also sent to Plaintiff's cell phone via text messages. *See Exhibit B.*

36. The contract and power of attorney Plaintiff received from Lupita revealed the company responsible for the calls.

37. On August 29, 2022, Plaintiff began to receive calls from a telemarketer calling on behalf of Defendants by the name of Harry Wilson that falsely identified the company he was calling on behalf of "American Debt Relief" advising Plaintiff that her credit cards were eligible for their "debt elimination" program. The Harry asked questions regarding Plaintiff's credit card debt, employment, wage rate, credit score and other identifiable information, but did not want to proceed because Plaintiff did not provide information on one of the credit cards as she did not have the card on hand.

38. Plaintiff then received several calls and text messages from Harry asking when Plaintiff would be available to continue the enrollment for "debt elimination". *See Exhibit C.*

39. Plaintiff answered one of the multiple calls from Harry who advised Plaintiff that a contract was sent to her several months ago and all she needs to do is sign it to start the program.

40. Plaintiff was then transferred another telemarketer from Defendants named Norman Stone who verified Plaintiff's information and solicited Plaintiff for "debt elimination" services on behalf of Defendants.

41. Plaintiff received another contract from Defendants that says Fortune 500 Consulting Group which came from a representative Sara Walker.

42. The contract has an address of 7942 W. Bell Rd. #C5-257, Glendale, AZ 85303 that was confirmed to be one of the addresses for Defendant Fortune 500 Consulting Group. *See Exhibit D.*

7

43. Defendant FORTUNE 500 falsely claimed they would eliminate Plaintiff ARREDONDO's credit card debt completely within three months if Plaintiff allowed them to charge $2,592.40 on her credit card.

44. The Defendants employ offshore unaccountable telemarketers outside the reach of the United States laws in an effort to avoid accountability under the TCPA. The Defendant's are aware of the false and misleading statements made by the telemarketers, and they approve of and ratify the behavior.

45. The Defendants scheme involves telling consumers to stop making the minimum payment on their credit cards in order to default then they will go and negotiate the bad debt with the financial company.

46. Defendants have approved and adopted a clandestine robocalling operation in which Defendants do not ever reveal their true identity until the contract is given at the end of the process so they may charge thousands of dollars to credit cards.

47. Defendant DISIMONE knew about and authorized the fraud being committed and authorized the behavior because it benefits him financially.

48. Defendant FORTUNE 500's telemarketers on multiple occasions misrepresented themselves and stated they were calling from Plaintiffs' credit card company or a generic company like "American Debt Relief" in an attempt to defraud Plaintiff and trick her into believing the phone calls were legitimate attempts from their credit card company to lower their interest rates and save Plaintiff's money.

49. Defendants actively engage in fraud and multiple states are now enacting legislation at the state level to combat the proliferation of companies engaged in "debt relief" and their attempts to defraud consumers.

50. Defendants and their agents and co-conspirators amassed lists of thousands of potential customers from public records, and data aggregators and then placed phone calls using auto dialing technology *en masse* to market their products.

51. Defendants participated in, facilitated, directed, authorized, knew of or willfully ignored the unlawful robocalling, while knowing facts that required a reasonable person to investigate further, and approved, and ratified the conduct of their employees, agents, and co-conspirators to engage in the false and misleading sales practices and unlawful robo calling.

52. Defendants have knowledge of and has adopted and maintained TCPA violations as a sales strategy.

53. Defendants refuse to take any action to stop or curtail the unlawful sales practices and robo-calling because these practices benefit both Defendants financially.

54. Defendants knew the calls were being directed into the Western District of Texas and the Defendants knew these actions could cause the Defendants to be summoned into court as a result of those actions.

55. Plaintiff never consented to receive the calls alleged herein. Plaintiff had no relationship with Defendants prior to the calls alleged herein.

56. Each and every call was initiated using a spoofed caller ID, and each and every telemarketer the Plaintiff spoke with failed to properly identify themselves and the parties they were calling on behalf of.

57. Each and every call Plaintiff received from telemarketers calling on behalf of Defendants were generated by an automatic telephone dialing system ("ATDS") or started with a prerecorded voice message.

58. The calls that were generated using an ATDS all started with a 3-4 second delay of dead air

followed by an audible tone before being connected to a telemarketer.

59. Plaintiff ARREDONDO received the following calls from the Defendants (Table A).

| 1. | 5/16/2022 | 12:09 PM | 915-999-9934 | Call from Jason Oliver. Generated by ATDS |
|---|---|---|---|---|
| 2. | 5/18/2022 | 10:45 AM | 915-999-8219 | Call from Jason Oliver. Generated by ATDS |
| 3. | 5/18/2022 | 11:16 AM | 480-565-3031 | Direct call from Sara Walker |
| 4. | 5/18/2022 | 11:24 AM | 707-744-3531 | Text from Sara Walker |
| 5. | 5/18/2022 | 11:24 AM | 707-744-3531 | Text from Sara Walker |
| 6. | 5/18/2022 | 11:24 AM | 707-744-3531 | Text from Sara Walker |
| 7. | 8/29/2022 | 10:40 AM | 201-677-8427 | Prerecorded voice message transferred to Harry Wilson call dropped |
| 8. | 8/29/2022 | 10:49 AM | 201-677-8427 | Call back from Harry Wilson. Generated by ATDS |
| 9. | 8/29/2022 | 10:54 AM | 201-677-8427 | Call from Harry Wilson. Generated by ATDS |
| 10. | 8/29/2022 | 11:40 AM | 201-677-8427 | Text from Harry Wilson |
| 11. | 8/29/2022 | 5:20 PM | 201-677-8427 | Missed call |
| 12. | 8/29/2022 | 5:23 PM | 201-677-8427 | Missed call |
| 13. | 8/29/2022 | 5:24 PM | 201-677-8427 | Missed call |
| 14. | 8/29/2022 | 5:25 PM | 228-299-2627 | Missed call spoof call |
| 15. | 8/29/2022 | 5:25 PM | 228-366-9648 | Missed call spoof call |
| 16. | 8/30/2022 | 9:08 AM | 201-677-8427 | Call from Harry Wilson transferred to Norman Stone. Generated by ATDS |

| 17. | 8/30/2022 | 9:11 AM | 201-677-8427 | Missed call |
|---|---|---|---|---|
| 18. | 8/30/2022 | 9:33 AM | 813-702-0405 | Call from Norman Stone. Generated by ATDS |
| 19. | 8/30/2022 | 9:50 AM | 201-677-8427 | Call from Harry Wilson. Generated by ATDS |
| 20. | 8/30/2022 | 9:53 AM | 201-677-8427 | Missed call |
| 21. | 8/30/2022 | 9:53 AM | 201-677-8427 | Missed call |
| 22. | 8/30/2022 | 9:53 AM | 201-677-8427 | Missed call |
| 23. | 8/30/2022 | 9:54 AM | 201-677-8427 | Missed call |
| 24. | 8/30/2022 | 9:56 AM | 201-677-8427 | Missed call |
| 25. | 8/30/2022 | 9:56 AM | 201-677-8427 | Text message |
| 26. | 8/30/2022 | 9:56 AM | 201-677-8427 | Text message |
| 27. | 8/30/2022 | 9:56 AM | 201-677-8427 | Text message |
| 28. | 8/30/2022 | 9:56 AM | 201-677-8427 | Text message |
| 29. | 8/30/2022 | 10:11 AM | 201-677-8427 | Missed call |
| 30. | 8/30/2022 | 10:58 AM | 201-677-8427 | Call from Harry Wilson. Generated by ATDS |

60. Each and every call was placed without the maintenance of an internal do-not-call policy.

61. Each and every call failed to properly identify the telemarketers and parties they were calling on behalf of.

62. Each and every call was placed without training their agents/employees on the use of an internal do-not-call policy.

63. Ms. Arredondo has limited data storage capacity on her cellular telephone. Incoming telemarketing calls consumed part of this capacity.

11

64. No emergency necessitated the calls

65. Defendants never sent Ms. Arredondo any do-not-call policy. On June 7, 2022, Plaintiff sent an internal do-not-call policy request to support@fortune500consultants.com which is on the contract that was sent to Plaintiff by email.

66. On information and belief, the Defendant FORTUNE 500 did not have a written do-not-call policy while it was sending Ms. Arredondo the unsolicited calls

67. On information and belief, the Defendants did not train its agents who engaged in telemarketing on the existence and use of any do-not-call list.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

68. As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

69. Every entity in the application for "credit card debt relief" should be deemed a beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third party telemarketer's compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## VICARIOUS LIABILITY OF DEFENDANTS FORTUNE 500 AND DISIMONE

70.     Defendants are vicariously liable for the telemarketing calls that generated the lead for them.

71. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA.

47 U.S.C. § 227(b)(2).

72. The FCC has explained that its "rules generally establish that the party on whose behalf a
solicitation is made bears ultimate responsibility for any violations." *In re Rules &
Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd.
12391, 12397 ¶ 13 (1995).

73. The FCC reiterated that a company on whose behalf a telephone call is made bears the
responsibility for any violations. *In re Rules and Regulations Implementing the Telephone
Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on
behalf of" liability in the context of an autodialed or prerecorded message call sent to a
consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

74. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post
may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were
> judgment proof, unidentifiable, or located outside the United States, as is
> often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer
> that physically places the call would make enforcement in many cases
> substantially more expensive and less efficient, since consumers (or law
> enforcement agencies) would be required to sue each marketer separately
> in order to obtain effective relief. As the FTC noted, because sellers may
> have thousands of independent marketers, suing one or a few of them is
> unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration
marks and internal quotation marks omitted).

75. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 3

76. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

77. To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

78. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

79. Defendants are legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

80. Defendants knowingly and actively accepted business that originated through illegal telemarketing.

81. Defendants knew (or reasonably should have known) that its telemarketer was violating the TCPA on its behalf but failed to take effective steps within FORTUNE 500's power to force the telemarketers to cease that conduct.

82. By hiring a company to make calls on its behalf, Defendants "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

83. Moreover, Defendants maintained interim control over the actions of its telemarketers.

84. For example, Defendants had absolute control over whether, and under what circumstances, they would accept a customer from its telemarketers.

85. Furthermore, Defendants had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendants and the ability to require them to respect the National Do Not Call Registry.

86. Defendants also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

87. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

88. "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

89. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

90. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

91.     Defendants are the liable parties as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "debt elimination" services on behalf of Defendants.

## DEFENDANT DISOMINE IS PERSONALLY LIABLE

92. "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable. See *United States v Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985)

93. The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct....or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001)

94.     Quoting Texas v. American Blastfax:
        The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA.

To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful contuct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is fare more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001)

95.     The Same Court held that corporate officers were also personally liable for DTPA violations:

The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct.....For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation......Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001

96. At all times material to the Complaint, acting alone or in concert with others, Defendant DISOMINE has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant FORTUNE 500 CONSULTING GROUP, including the acts or practices set forth in this Complaint.

17

97. Defendant DISOMINE is the president, director, secretary, treasurer, and vice-president of Defendant FORTUNE 500 CONSULTING GROUP and control the day-to-day operations of FORTUNE 500 CONSULTING GROUP and directed their employees, agents, salespersons, and solicitors to make TCPA violating phone calls and to solicit "debt elimination" and "zero percent interest" services.

98. Defendant DISIMONE approved the telemarketing scripts, signed the contracts, paid commissions for the illegal behavior, and directed the illegal calls to be made for his financial benefit.

99. Defendant DISIMONE are not mere bystanders. He is the mastermind that schemed, planned, directed, initiated, and controlled the illegal and fraudulent behavior.

100. Defendant DISIMONE are well aware Defendants' conduct violated the TCPA and Tex. DPTA and refused to alter their behavior. Defendant DISIMONE is the sole director of FORTUNE 500 CONSULTING GROUP and the only person with the power to make the unlawful, fraudulent, and unethical behavior stop. Yet, he has taken no steps to stop the behavior because the behavior benefits them financially. Defendant DISIMONE breaks the law with his eyes and pocketbooks wide open.

101. Defendant DISOMINE should be held jointly and severally liable for both the TCPA violations and Tex. Bus. Com. Code 302.101 via Tex. DTPA because they actually committed the conduct that violated the TCPA and Tex. DTPA, and/or they actively oversaw and directed this conduct.

102. Defendant DISIMONE should be held personally liable because to do otherwise would simply allow him to simply dissolve FORTUNE 500 CONSULTING GROUP and set up a new corporation and repeat his conduct. This would result in both the TCPA and DTPA being

18

unenforceable.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES

## AS A RESULT OF THE CALLS

103.    Defendants' calls harmed the Plaintiffs by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

104.    Defendants' calls harmed the Plaintiffs by trespassing upon and interfering with Plaintiffs' rights and interests in Plaintiffs' cellular telephone.

105.    Defendants' calls harmed the Plaintiffs by trespassing upon and interfering with Plaintiffs' rights and interests in Plaintiffs' cellular telephone line.

106.    Defendants' calls harmed the Plaintiffs by intruding upon Plaintiffs' seclusion.

107.    The Plaintiffs have been harmed, injured, and damages by the calls including, but not limited to:

- Reduced Device Storage space and reduced data plan usage

- Invasion of privacy

- Reduced enjoyment and usage of her cell phone

- Reduced battery usage

- Anger and Frustration

### The Plaintiffs' cell phone is a residential number

108.    The calls were to the Plaintiffs' cellular phone (XXX)-XXX-8219, which is Plaintiff's personal cell phone that he uses for personal, family, and household use. The Plaintiff maintains no landline phones at her residence and have not done so for at least 10 years and primarily rely on cellular phones to communicate with friends and family. The Plaintiff also

uses her cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. The Plaintiffs further have their cell phone registered in their personal name, pay their cell phone from their personal accounts, and the phone is not primarily used for any business purpose.

<strong>Violations of the Texas Business and Commerce Code 305.053</strong>

109.    The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violates 47 USC 227(b). The calls by the Defendants violated Texas law by placing illegal telemarketing calls with a to a cell phone which violates 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

110.    The calls by the Defendants violated Texas law by spoofing the caller IDs per 47 USC 227(e) which in turn violates the Texas statute.

<strong>Violations of the Texas Business and Commerce Code § 302.101</strong>

111.    The actions of the Defendants violated the Texas Business and Commerce Code 302.101 by placing solicitation phone calls to a Texas resident without having a registration certificate and bond on file with the Texas Secretary of State.

112.    Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

<strong>I.      FIRST CLAIM FOR RELIEF</strong>

## Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A)

### (Against All Defendants)

113.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

114.   The foregoing acts and omissions of the Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing calls to Plaintiff's cellular telephone numbers without her prior express written consent.

115.   Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

116.   Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

117.   Plaintiff also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency illegal telemarketing calls to cellular telephone numbers without the prior express written consent of the called party.

## I. SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

118.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

119.   The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.      a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

b.      training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2);[3] and,

c.      in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

120.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

121.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

122.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

123.    Plaintiff also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making telemarketing solicitations until and unless they (1) implement a do-not-call list and training thereon and (2) include the name of the individual caller and name in the solicitations.

## II.  THIRD CLAIM FOR RELIEF:

### Violations of the TCPA "Sales/DNC" Prohibitions 47 C.F.R. § 64.1200(c)

### (Against All Defendants)

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

124.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

125.    Defendants called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F) and 47 C.F.R. § 64.1200(c)(2).

126.    Plaintiff was statutorily damaged at least thirty (30) times under 47 U.S.C. § 227(c)(3)(F) by the Defendants by the telephone calls described above, in the amount of $500 per call.

127.    Plaintiff is entitled to an award up to $1500 in damages for each knowing and willful violation of 47 U.S.C. § 227(c)(3)(F).

### III.  FOURTH CLAIM FOR RELIEF:

### Violations of The Texas Business and Commerce Code 305.053

128.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

129.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing illegal calls to Plaintiff's cellular telephone numbers without her prior express written consent in violation of 47 USC 227 et seq. Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

130.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. **Texas Business and Commerce Code 305.053(b)**

131.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

23

## IV.  FIFTH CLAIM FOR RELIEF:

### Violations of The Texas Business and Commerce Code 302.101

132.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

133.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 302.101**, by making non-registered solicitation calls to Plaintiff's cellular telephone number without her prior express written consent.

134.    Plaintiff is entitled to an award of up to $5,000 in damages for each violation of Texas Business and Commerce Code 302.302.

135.    Plaintiff is entitled to an award for all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees and attorney's fees.

## V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff MABEL ARREDONDO prays for judgment against the Defendants jointly and severally as follows:

A.  Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.  A declaration that actions complained of herein by Defendant violate the TCPA and Texas state law;

C.  An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

24

D. An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation for 30 calls.

E. An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F. An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101.

G. An award to Plaintiff of damages, as allowed by law under the TCPA;

H. An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and equity

I. Such further relief as the Court deems necessary, just, and proper.

September 16, 2022,                               Respectfully submitted,


*Mabel Arredondo*

Mabel Arredondo
Plaintiff, Pro-Se
9328 Lait Drive
El Paso, TX 79925
915-999-8219
Mabel.arredondo22@gmail.com

25



PLAINTIFF'S
EXHIBIT

**A**



**Fortune 500 Consulting Consumer Agreement**

**Phone: 1 (800) 571-3011    Fax: 1-866-453-7554**

**Email: support@fortune500consultants.com**

| Client Information | Co-Applicant or Guardian Information |
|---|---|
| Client's Name: **MABEL ARREDONDO** | Co-Applicant Name: |
| Date of Birth: **12/22/1979** | Date of Birth: |
| Last four SSN: **0812** | Last four SSN: |
| **Client Mailing Information** | **Co-Applicant or Guardian Mailing Information** |
| Street Address: **9328 Lait Dr** | Street Address: |
| Apt./Suite/etc.: | Apt./Suite/etc.: |
| City: **El Paso** | City: |
| State: **TX** | State: |
| Zip: **79925** | Zip: |
| **Client Contact Information** | **Co-Applicant or Guardian Contact Information** |
| Home Phone: | Home Phone: |
| Cell Phone: **915-999-8219** | Cell Phone: |
| Email Address: **mabel.arredondo22@gmail.com** | Email Address: |

FORTUNE 500 PROVIDES CONSUMER SERVICES SUCH AS DOCUMENT PREPARATION.
INDEPENDENT SERVICE PROVIDERS ASSIST FORTUNE 500 CLIENTS AND PROVIDE ADDITIONAL
BENEFITS & SERVICES. FORTUNE 500 IS NOT A LAW FIRM. INFORMATION PROVIDED BY

ID: 6102340 Signed: 1969-12-31T18:00:00-06:00

REPRESENTATIVES OF FORTUNE 500 SHOULD NOT BE MISCONSTRUED AS LEGAL ADVICE.
FORTUNE 500 IS NOT A GOVERNMENT AGENCY.



**Fortune 500 Consulting Consumer Agreement**

**Phone: 1 (800) 571-3011      Fax: 1 (866) 453-7554**

**Email: support@fortune500consultants.com**

## CONSUMER SERVICES

The following Agreement (hereafter the "Agreement") is made effective as of                    , by and between Fortune 500 Consulting, LLC (hereafter the "Company" or "Fortune 500"), and **MABEL ARREDONDO**, (hereafter the "Client"). The Company will be providing Services wherein the Company assists you in the preparation of documents. All documents will be drafted at your request and executed by you.

### DESCRIPTION OF SERVICES TO BE PERFORMED BY THE COMPANY

1. Review and gauge information to consult with you regarding initial documents provided by you.
2. Assemble your file for analysis to devise a plan of action to include the items you have requested assistance with.
3. Educate you concerning many laws including but not limited to; the Fair Credit Reporting Act (FCRA), the Fair Debt Collection Practices Act (FDCPA), the Telephone Consumer Protection Act of 1991 (TCPA).
4. Aid in producing documents requesting information from your enrolled accounts.
5. Evaluate and assist with the verification process of enrolled accounts.
6. Analyze documents provided by third party collection agencies to discover if your consumer rights may have been violated.
7. Assist you in the conception of various document types such as letters, faxes, or electronic communications to the related and other associated companies in the pursuit to correct any misinformation and offenses.
8. Provide access to discounted benefits offered by independent third party service providers.
9. Provide education regarding potential violations of your consumer rights by third parties.
10. Unless otherwise agreed between the parties the maximum term of this agreement should be no more than 36 months.

## ADDITIONAL BENEFIT SERVICES

If needed, the Company will also provide you with referrals of law firms who specialize in defending consumers. The Company does not charge an extra fee to you for making such a recommendation.  Attorneys accept cases on a contingency basis. Should they choose to accept you as a client of their respective law firm they will enter into a separate agreement with you at that time.

## ACTIONS REQUIRED OF YOU

1. You agree to provide the Company with any and all correspondence you receive during your enrollment in the company's program within three (3) business days of the date you receive such correspondences.

Initial Here: _____

## SERVICE FEES

Company will charge a fee of **$199.53** for **12** monthly payments which includes a Monthly Account Maintenance fee of $6.25,

and a Monthly ACH Bank Draft fee of $6.75. Company also charges an Initial Account Assessment fee of $198 that is not included in the previously mentioned payments and you may choose whether to pay this fee in full on your first payment or split equally over your first two payments. The detailed payment schedule you selected is shown below on page 7.

## REFUND POLICY

If a collector whom the Company has requested documentation from files a lawsuit against Client, no refund will be due from Company to Client, however, Company will provide a referral to an independent attorney and Company will pay Client's legal fees incurred settling the suit, provided that Client uses the referred attorney. Client will remain the responsible party for repaying the settlement/judgement amount to creditor. No Refunds unless the following single exception occurs: If your collection account is fully verified and validated by a collector, including such collector submitting complete and accurate documentation to you in response to its requests for accountings, and other items required by the Company from the collector, you will receive a full refund proportionate to the fee paid for that specific account. Should you have an outstanding balance of Company program fees, any refunds will be directly applied to that outstanding balance. You agree that the following fees are non-refundable even if one of the exceptions to the no refunds policy occurs: $198 Initial Account Assessment, $6.25 Monthly Account Maintenance Fee and $6.75 Monthly ACH Bank Draft Fee.

Initial Here: _____

## DISPUTE RESOLUTION

In the event of any controversy, claim or dispute between the parties arising out of or relating to this agreement or the breach, termination, enforcement, interpretation, or validity thereof, including any determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in California or in the county in which the consumer resides in accordance with the Laws of the State of California for agreements to be made in and to be performed in California. The parties agree that the arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its rules and procedures and an arbitrator shall be selected by the AAA. The arbitrator shall be neutral and independent and shall comply with the AAA code of ethics. The award rendered by the arbitrator shall be final and shall not be subject to vacation or modification. Judgment on the award made by the arbitrator may be entered in any court having jurisdiction over the parties. If either party fails to comply with the arbitrator's award, the injured party may petition the circuit court for enforcement. The parties agree that either party may bring claims against the other only in his/her or its individual capacity and not as a Plaintiff or Class Member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings of more than one person's claims and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost (except attorney's fees) of arbitration equally. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit, including a reasonable attorney's fee for having to compel arbitration or defend or enforce the award. Binding Arbitration means that both parties give up the right to a trial by a jury. It also means that both parties give up the right to appeal from the arbitrator's ruling except for a narrow range of issues that can or may be appealed. It also means that discovery may be severely limited by the arbitrator. This section and the arbitration requirement shall survive any termination.

Initial Here: _____

## COMPANY'S RIGHT TO CONDUCT BUSINESS ELECTRONICALLY AND TO CONTACT YOU

You agree, unless specifically requested otherwise, that by entering into transactions with the Company, you affirm consent to receive, in an electronic format, all information, copies of agreements and correspondences from Company and to also send information in an electronic format unless previously agreed upon in writing by the Company. You consent and agree that the Company may provide all disclosures, periodic statements, notices, receipts, modifications, amendments, and all other

evidence of transactions electronically. All electronic communications will be deemed to be valid and authentic, and you intend and agree that those electronic communications will be given the same legal effect as written and signed paper communications. You have a right to receive a paper copy of any of these electronic records if applicable law specifically requires us to provide such documentation. Your consent may be withdrawn at any time upon the Company's receipt of such withdrawal. However, your withdrawal of your consent to conduct business electronically can only occur if applicable law specifically requires the Company to provide a paper copy of electronic documents. Withdrawal of consent will slow the speed at which Company can complete certain steps in transactions with you and delivering services to you. To inform the Company that you either withdraw your consent to receive future notices and disclosures in electronic format, would like to receive paper copies, or to update your information, you may send such request to the address that has been provided to you for the Company. The Company takes all precautionary measures to make sure all electronic information exchanged is treated with every secure resource available to us; this being said, you acknowledge and agree that the internet is considered inherently insecure no matter the security measures the Company puts in place. Therefore, you agree that the Company has no liability to you whatsoever for any loss, claim, or damages arising or in any way related to the Company's responses to any electronic communication, upon which the Company has in good faith relied. At all times, you maintain the sole obligation to ensure you can receive the Company's electronic communications, and access them on a regular and diligent basis. You also agree to be contacted by telephone on your landline and/or cell phone by the Company irrespective of whether your telephone number appears in any state or federal "Do Not Call" lists. You further agree that the Company may use a computerized dialing system to contact you via telephone or SMS text, and the Company may use a pre-recorded message when contacting you via telephone or SMS text. You understand that your consent to be contacted does not require you to purchase any goods or services from the Company. To inform the Company that you either withdraw your consent to receive communications from the Company as described directly above, or to update your information, you may send such requests to the address that has been provided to you for the Company.

## **CLIENT ACKNOWLEDGEMENTS**

a) I understand that Fortune 500 Consulting (Fortune 500) is not a lender or debt negotiators. I understand that Fortune 500 is not a law firm nor are they attorneys. I understand Fortune 500 is not a government agency.

Initial Here: _____

b) I understand there is a chance that a creditor or collector may take legal action against an account I have enrolled with Fortune 500, however Fortune 500 will refer an independent law firm that I may retain to assist me.

Initial Here: _____

c) I understand that should I receive any correspondence while enrolled in Fortune 500 program, I am required to forward that documentation to Fortune 500 within three (3) days of its receipt. Documentation includes, but is not limited to, communications (in the form of mail, email, fax, SMS communications, voicemails, etc.) from third parties or other companies to which I am submitting relevant documentation.

Initial Here: _____

d) I acknowledge that Fortune 500 does not guarantee I will receive any type of financing or additional benefits because of services Fortune 500 provides.

Initial Here: _____

e) I understand that should there be issues with my Automatic Clearing House (ACH)/Electronic Fund Transfer (EFT)/Debit or Credit Card payments, the Company has the right to debit my scheduled monthly payments via Check-by-Phone, using the banking information provided in this agreement.

Initial Here: _____

f) I understand that Fortune 500 Consulting will be the entity debiting my account and that each monthly payment will have an ACH fee of $6.75 for drafting my bank account plus a fee of $6.25 for Account Maintenance.

Initial Here: _____

a) The following fees are non-refundable even if I later qualify for a prorated refund for one of my enrolled accounts: $198 Initial Account Assessment, $6.75 Monthly ACH Bank Draft Fee, and $6.25 Monthly Account Maintenance Fee.

Initial Here: _____

h) I acknowledge that if my monthly payment is returned by my bank for insufficient funds that I will pay a $30 fee to Fortune 500. Furthermore, if my payment is returned by my bank as "unauthorized", I will pay a fee of $500 to Fortune 500 as well as any legal fees incurred by Fortune 500 in contending the claim.

Initial Here: _____

i) I understand I may be terminated from Fortune 500 Document Preparation Assistance Program for reasons, including but not limited to my inability to make successful, on time, monthly payments, as per my agreement with Fortune 500.

Initial Here: _____

j) I acknowledge that NO representative of Fortune 500 or my Enrollment Advisor advised me to discontinue paying my bills.

Initial Here: _____

k) I understand that Fortune 500 DOES NOT pay off my alleged creditors with the funds that I pay, rather those funds go directly to pay Fortune 500 for preparation of documents and other services it provides to me through independent service providers.

Initial Here: _____

l) I understand that if I voluntarily remove an enrolled account from Fortune 500 Document Preparation Assistance Program, I am not due a refund beyond any credits to my remaining monthly payments due to Fortune 500.

Initial Here: _____

m) I acknowledge that the Company retains the option of utilizing any third party entities to provide services to me. I also understand that any services provided by independent service providers are NOT being provided by Fortune 500.

Initial Here: _____

n) I understand that Fortune 500 does not reduce or eliminate my debt (Initial Here: _____) but rather assists me with preparing

documents for me to send to third parties to determine whether the accounts are valid, and my file is accurate.

Initial Here: _____

o) I understand that the addition of new derogatory information will negatively impact results. I also understand that Fortune 500 will only assist me in preparing documents, as allowed by State and Federal law, and I understand that Fortune 500 makes no claim beyond those changes allowed by State and Federal law.

Initial Here: _____

p) I give authorization to the independent law firm that may assist me with violation identification, to transfer funds to Fortune 500 in the event I receive restitution from collectors and/or creditors to pay off any outstanding balances owed to Fortune 500, if I so choose.

Initial Here: _____

q) I understand that I am able to prepare any of the documentation on my own without joining the Document Preparation Assistance Program or help from Fortune 500. I am entering into this agreement voluntarily and sought their help independently.

Initial Here: _____

r) I agree and acknowledge the fact that I remain personally responsible for all of my enrolled accounts irrespective of how such accounts are reported to the credit reporting agencies, even if I have defaulted on such accounts, or if Fortune 500 fails to respond to a request, and/or responds to such request with insufficient documentation.

Initial Here: _____

s) I consent to receiving e-mail, SMS texts on a cell phone, facsimile transmissions, land line telephone calls, cell phone calls, voice mails, telephone calls made via the use of an auto dialer with pre-recorded messages irrespective of whether my telephone numbers appear on any state of federal "Do Not Call" lists, and direct mail from Fortune 500. I understand that if I have a cost associated with the communication, the costs are my sole responsibility and not that of the Company. I understand that consent does not obligate me to enroll in any program or make any purchase or to receive free information.

Initial Here: _____

t) I will provide a copy of my driver license for the purpose of enrolling into the Fortune 500 Document Preparation Assistance Program

Initial Here: _____

u) I consent to having Fortune 500 Consulting 7272 E Indian School Rd #540-36 Scottsdale, AZ 85251 receive mail on my behalf as it relates to my enrolled accounts, creditors, and third parties contacting me via mail. I also authorize Fortune 500 Consulting and its designated affiliates to open mail on my behalf in order to assist me with document preparation for my enrolled accounts.

Initial Here: _____

## ENROLLED ACCOUNTS

Please make a list below that includes the name of each creditor along with their contact information.
Provide a copy of your driver license along with account number and balance for each creditor.
For each account, send copies of your billing statements to:

**FORTUNE 500 CONSULTING**
**7942 W. Bell Rd. #C5-257**
**Glendale AZ 85308.**

| Creditor | Account # | Debt Balance |
|---|---|---|
| CCB/ULTAMC | 5368171031182243 | $2,949.00 |
| CAP ONE | 517805832942 | $2,386.00 |
| | | **$5,335.00** |

## SCHEDULED PAYMENTS

I agree to this list of payments and payment dates - Initial Here: _____.

| # | Date | Initial Account Assessment | Subscription Fee | Account Maintenance | ACH Bank Draft | Total Payment |
|---|------|---------------------------|------------------|---------------------|----------------|---------------|
| 1 | Jun 01, 2022 | $99.00 | $177.83 | $14.95 | $6.75 | $298.53 |
| 2 | Jul 01, 2022 | $99.00 | $177.83 | $14.95 | $6.75 | $298.53 |
| 3 | Aug 01, 2022 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 4 | Sep 01, 2022 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 5 | Oct 01, 2022 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 6 | Nov 01, 2022 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 7 | Dec 01, 2022 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 8 | Jan 01, 2023 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 9 | Feb 01, 2023 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 10 | Mar 01, 2023 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 11 | Apr 01, 2023 | $0.00 | $177.83 | $14.95 | $6.75 | $199.53 |
| 12 | May 01, 2023 | $0.00 | $177.87 | $14.95 | $6.75 | $199.57 |
| | | $198.00 | $2,134.00 | $179.40 | $81.00 | $2,592.40 |

Total Scheduled Payments: $2,592.40

**SIGNATURE AUTHORIZATION**

I, MABEL ARREDONDO, hereby authorize Fortune 500 Consulting to affix my electronic signature to documents that I want sent out to third parties with whom I am currently disputing claims.  I understand that an electronic signature is equally as binding as a physical signature. I have provided Fortune 500 Consulting with my electronic signature for the express purpose of preparing and sending documents that I wish to have sent of my own free will.

I also understand that Fortune 500 Consulting will contact me via email three (3) business days prior to sending out any verification document containing my electronic signature, so I may review the document. I understand that I have the right to request that Fortune 500 Consulting not affix my digital signature to documents if I inform Fortune 500 Consulting not to do so within 48 hours of receiving the notification email. I understand that if I choose to deny Fortune 500 Consulting document preparation services, Fortune 500 Consulting is not in violation of the agreement.

**DO NOT SIGN THIS SIGNATURE AUTHORIZATION UNTIL YOU HAVE READ IT IN ITS ENTIRETY. BY SIGNING BELOW YOU ALSO ACKNOLWEDGE YOU HAVE RECEIVED AND READ THE NOTICES OF CANCELLATION REQUIRED BY STATE AND FEDERAL LAW, EVEN IF OTHERWISE ADVISED. BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF THSES DISCLOSURES PRIOR TO THE TIME OF SIGNING AND AGREE TO THE TERMS OF THIS AGREEMENT.**

Client Signature: _____          Date: _____

Printed Name: MABEL ARREDONDO

Co-Applicant/Guardian
Signature: _____          Date: _____

Printed Name: _____

YOU, THE CLIENT AND THE GUARDIAN, ARE ENTITLED TO AN EXACT COPY OF THIS AGREEMENT AS WELL AS ANY OTHER WRITING SIGNED BY YOU IN CONNECTION WITH THIS AGREEMENT AT THE TIME YOU SIGN.

**NOTICE OF CANCELLATION**

YOU MAY CANCEL THIS AGREEMENT AT ANY TIME. FUTURE FEES WILL CEASE WITHIN FIVE DAYS OF RECEIPT OF THIS CANCELLATION NOTICE. ALL FEES PREVIOUSLY CHARGED WILL BE GOVERNED BY OUR REFUND POLICY.

TO CANCEL THIS AGREEMENT EMAIL OR FAX A SIGNED, DATED COPY OF THIS CANCELLATION NOTICE, OR ANY OTHER WRITTEN NOTICE. YOU WILL ALSO NEED TO CONTACT OUR OFFICE BY TELEPHONE TO CONFIRM THE RECEIPT OF YOUR WRITTEN CANCELLATION NOTICE.

**EMAIL ADDRESS:** support@fortune500consultants.com
**FAX NUMBER:** 1 (866) 453-7554
**MAILING ADDRESS:** 7942 W. Bell Rd. #C5-257 Glendale AZ 85308.

**CLIENT ID:**_____

**CLIENT NAME (Printed):**_____

**CLIENT PHONE NUMBER::**_____

---

I hereby cancel this agreement,



---

CLIENT SIGNATURE                                    DATE

---

**NOTICE: ONLY COMPLETE THIS SECTION IF CANCELLING AGREEMENT**

## INFORMATION STATEMENT

**Please sign below the following paragraph to confirm you have a clear understanding of the services being provided to you by Fortune 500 Consulting (Fortune 500).**

Fortune 500 Document Preparation Assistance Program is designed to help you prepare requests for verification of alleged debts to be sent to collection agencies – we also assist you in preparing documents to ensure collection information for your enrolled accounts is not being reported.

Should you require additional accounts to be disputed, we have the ability to identify an independent, licensed credit repair company that may be able to facilitate additional credit report disputes on your behalf. Should you require credit restoration or credit repair, Fortune 500 may be able to identify a licensed credit repair company in your state to assist you with this at no additional charge.

Initial Here:

Upon enrollment in the Document Preparation Assistance Program you will also be offered other benefits through independent service providers; these benefits include but are not limited to education regarding debt verification programs, good financial habits, and credit health.

You will also receive education regarding consumer rights from an independent law firm and should you feel that your rights may be being violated by creditors or collectors, Fortune 500 will provide you with the identity of an independent law firm that specializes in the identification of consumer rights violations. Should this law firm identify violations of your rights, they will enter into a separate agreement with you at that time to assist in filing disputes. This law firm takes cases on a contingency basis at no additional cost to you.

It is possible to receive a summons from a creditor. Should a creditor or collector take legal action against you regarding an account you have enrolled with Fortune 500, you will receive a prorated refund of funds paid in towards that account, please see your agreement for the ways that refund may be paid to you. Fortune 500 will also provide you with the information of an independent law firm that may assist you in settling your case for a flat, reduced retainer amount. You may also retain an attorney of your choosing.

**I understand that Fortune 500 is not offering me any type of loan or financing. I understand that Fortune 500 is not paying or reducing any of my enrolled accounts. I understand that Fortune 500 Document Preparation Assistance Program is designed to help me create paperwork requesting verification of my enrolled accounts from collection agencies and to correct any inaccuracies in my file.**

Client Signature: _____        Date: _____

Printed Name: MABEL ARREDONDO _____

Co-Applicant/Guardian
Signature: _____        Date: _____

Printed Name: _____

## PRIVACY POLICY OF FORTUNE 500 CONSULTING

### WHAT DOES FORTUNE 500 CONSULTING DO WITH YOUR PERSONAL INFORMATION?

**Why?** Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information.

### Please read this notice carefully to understand what we do.

1. The type of personal information we collect and share depends on the product or service you have with us. This information can include:  Specific product or service needs, Social Security Numbers, Credit Profile, Address & Payment Information.
2. All financial companies need to share personal information to run their everyday business. In the section below, we list the reasons financial companies can share their personal information; the reasons chosen to share; and whether you can limit this sharing.

| Reasons we can share your info | Do we share your info? | Do we share your info? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), or to respond to court orders and legal investigations. | Yes, we share your info with necessary parties to help facilitate the products and services that you have contracted for. | No. |
| For our marketing purposes— to offer our products and services to you. | We share your info with vendors that assist us in offering various opportunities to you. | Yes, you can opt out of receiving any marketing from us for any products other than the products or service you have contracted for. |
| For joint marketing with other financial companies. | We occasionally share information with other financial and non-financial entities. | Yes, you can opt out of any non-essential sharing with third parties. |
| For our affiliates' everyday business purposes— information about your transactions and experiences. | Yes, we share your info with affiliated parties to help facilitate your goals. | Yes, you can opt out of any non-essential sharing with third parties. |
| For our affiliates' everyday business purposes— information about your creditworthiness. | For our affiliates' everyday business purposes— information about your creditworthiness. | Yes, you can opt out of any nonessential sharing with third parties. |

### To limit our sharing of information or for ANY Questions: Call us at:  1 (800) 571-3011

Please note, if you are a new customer, we can begin sharing your information 5 days from the date we send this notice. When you are no longer our customer, we continue to share your information as described in this notice. However, you can contact us at any time to limit our sharing.

### How does Fortune 500 Consulting protect my personal information?

To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards, encrypted storage of all personal information, data security and breach protocols, and secured files and buildings. All employees are trained and monitored on privacy and security protocols. We monitor all offices with cameras and protect them with monitored alarm systems. We additionally destroy all physical

documents after they are no longer needed and keep electronic copies of them in a secure encrypted environment.

### How do we collect your personal information?

We collect your personal information from any and all interactions that you have on our website. Our portals, email communications, telephonic communications, mail services and face to face interactions.

### Why can't I limit all sharing?

Although federal law does not require us to, we give you the right to limit any sharing that is not directly needed to facilitate our contracted services and or delivery of contracted products.

### What happens when I limit my sharing for an account I hold jointly with someone else?

We limit sharing for both individuals to ensure protection of your wishes.





PLAINTIFF'S
EXHIBIT

B

+1 (707) 744-3531

55251e785f716b747b43c498
5c100fd3

Mon, Apr 18, 11:44 AM

Hi Mabel, it's Mike Terranova
from Consumer Shield. We
were set to begin working on
your debt today, but we have
not yet received your
verification documents. Please
give us a call at your
convenience at
1-800-571-3011

Wed, May 18, 11:24 AM

https://clixsign.com/sign/
84824f24ec8c222f817d3133d
3cd5ea1

https://clixsign.com/sign/
173a6ec056e1a7b8e8c005d0
0b550bbb

https://clixsign.com/sign/
2cf1835ec5c75c8cc8744b154
d299cc0












9:12

PLAINTIFF'S EXHIBIT

C

‹ Recents



# +1 (201) 677-8427

Oakland, NJ


message


call


video


pay

## Yesterday

10:54 AM  **Incoming Call**
2 minutes

10:49 AM  **Incoming Call**
5 minutes

10:40 AM  **Incoming Call**
7 minutes

Calls with a checkmark have been verified by the carrier.

Share Contact

Create New Contact

Add to Existing Contact


Favorites


Recents


Contacts


Keypad


Voicemail

9:14

< Recents



# +1 (201) 677-8427

Oakland, NJ


message


call


video


pay

## Yesterday

5:24 PM  **Missed Call**

5:23 PM  **Missed Call**

5:20 PM  **Missed Call**

Calls with a checkmark have been verified by the carrier.

Share Contact

Create New Contact

Add to Existing Contact

Add to Emergency Contacts


Favorites


Recents


Contacts


Keypad


Voicemail

9:17

**‹ Recents**



# +1 (228) 299-2627

Pearlington, MS


message


call


video


pay

**Yesterday**

5:25 PM  **Missed Call**

Share Contact

Create New Contact

Add to Existing Contact

Add to Emergency Contacts

Share My Location

Block this Caller


Favorites


**Recents**


Contacts


Keypad


Voicemail



9:17





+1 (201) 677-8427

Text Message
Yesterday 11:40 AM

Hi Ms. Arredondo, This is Harry Wilson with the American Debt Relief, My Phone number is 201-677-8427 on which you can call me back till 7oclock your time. Thank You











**10:55**   .ıl 🤙 🔋



**‹** Recents



# +1 (201) 677-8427
### Oakland, NJ


message


call


video


pay

### Today

9:11 AM   **Canceled Call**

9:08 AM   **Incoming Call**
           21 minutes

Calls with a checkmark have been verified by the carrier.


## Share Contact

## Create New Contact

## Add to Existing Contact

## Add to Emergency Contacts


Favorites


**Recents**


Contacts


Keypad


Voicemail

**2:06**

 **Recents**



# +1 (201) 677-8427

Oakland, NJ

 **message**    **call**    **video**    **pay**

## Today

9:53 AM   **Missed Call**

9:53 AM   **Missed Call**

9:52 AM   **Missed Call**

Calls with a checkmark have been verified by the carrier.

Share Contact

Create New Contact

Add to Existing Contact

Add to Emergency Contacts

 Favorites    **Recents**    Contacts    Keypad    Voicemail

 **Better Business Bureau**®


PLAINTIFF'S
EXHIBIT

**D**

**Not BBB
Accredited**

**Business Profile**

# Fortune 500 Consulting Group, Inc

Consultant

## Contact Information

📍 7942 W Bell Road #257
Glendale, AZ 85308

🌐 https://fortune500consulting.com

📞 (888) 880-5152

## BBB Rating & Accreditation

# F

THIS BUSINESS IS NOT BBB ACCREDITED

Search for Accredited
Businesses in this category

**Years in Business:** 6

**Customer Reviews are not used in the calculation of BBB Rating**

Reasons for BBB Rating

## Customer Reviews